## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Lisa Ann Lafferty,<br><br><br>                                        Debtor. | C/A No. 11-04523-DD<br><br>Chapter 7 |
| In re,<br><br>William Raymond Lafferty,<br><br><br>                                        Debtor. | C/A No. 11-04524-DD<br><br>Chapter 7<br><br><br>**ORDER** |

This matter is before the Court on Motions to Avoid Judicial Lien ("Motions") filed by Lisa Ann Lafferty and William Raymond Lafferty ("Debtors") on September 4, 2011 and Objections to Exemption ("Objections") filed by Michelle L. Vieira, the chapter 7 trustee ("Trustee") on September 30, 2011. SCBT, N.A. f/k/a South Carolina Bank and Trust, N.A. ("SCBT") filed Objections to Debtors' Motions on October 3, 2011 and joined in Trustee's Objections on October 17, 2011. Following the close of discovery, a hearing was held on the matters on February 21, 2012. Debtors are former husband and wife, and the exemption at issue is claimed in residential real property owned jointly by Debtors; as a result, because the issues in Debtors' cases were identical, the matters were tried together. At the conclusion of the hearing, the Court took the matters under advisement. The Court now issues the Following Findings of Fact and Conclusions of Law, applicable in both cases.

**FINDINGS OF FACT**

Debtors filed their chapter 7 cases on July 19, 2011.  At the time they filed their bankruptcy petitions, Debtors were divorced.[1]  Testimony established that the divorce proceedings were extremely contentious, lasted three and a half years, and cost the parties over $100,000 in attorney fees.  However, at some point after the divorce proceedings had concluded, or perhaps during the divorce proceedings,[2] the parties developed a more friendly relationship.  At the time of this hearing, Debtors claimed to live together and maintained a non-exclusive sexual relationship.

Ms. Lafferty's bankruptcy schedules reflect that she earns $1,400 per month as a substitute carrier for a local newspaper and $650 per month in rental income from a condominium.  Her Schedule I also indicates that she receives family assistance from time to time, although it does not list an amount.  Her Schedule J shows expenses of $2,054.00 per month, leaving her with negative monthly disposable income of $4.00.  Mr. Lafferty's Schedule I reflects that he is unemployed but that he receives $1,500 per month in financial assistance from relatives.  His Schedule J reflects monthly expenses of $1,560.00, leaving him with negative monthly disposable income of $60.00.  The financial income and expense information submitted to the Court by Debtors is relevant to Debtors' living arrangements and credibility.

The current controversy centers around the former marital home, which is jointly owned by Debtors.  The property at issue is a four bedroom, two and a half bath home located on Fallen Timber Drive in Myrtle Beach, South Carolina ("Fallen Timber").  The Horry County Tax Office values the home at $393,400.00.  There are no mortgages on the property.  However, SCBT holds a judgment lien which attached to the property when it was recorded in Horry County in

---

[1] An appeal to the South Carolina Supreme Court is pending as to certain issues decided in the divorce decree.
[2] Testimony on this point, like most of the testimony presented in this case, was conflicting.

August 2010. The judgment lien arises from a deficiency following the foreclosure of a mortgage lien on commercial property which Debtors formerly owned; the underlying obligation was guarantied by Debtors. The amount of the judgment on the date the bankruptcy petitions were filed was $422,031.08.  Debtors do not maintain homeowners' insurance on the property, and Debtors testified that they believed the property had not been insured since 2008.  Further, the property was sold at a county ad valorem tax sale in November 2010 for unpaid property taxes. SCBT, as a lienholder, protected its interest and paid the $5,137.87 tax bill.

The house at Fallen Timber was built in 2000 by Debtors, and Debtors apparently lived in the home until the commencement of their divorce proceedings in 2007.  What transpired as to the property after that time is somewhat unclear; however, it is undisputed that both parties moved out of and remained away from the house during the divorce proceedings.  After Debtors' separation, both parties became romantically involved with other parties; Ms. Lafferty became involved with Derek Rippy and Mr. Lafferty became involved with Regina Land.  In January 2010, Debtors signed a quitclaim deed transferring their interests in the Fallen Timber property to Mr. Rippy and Ms. Land; however, this deed was not recorded until December 2010.  In August 2010, on the same date that SCBT obtained its judgment against Debtors, Debtors signed a listing agreement for the property with a real estate agency. No one was living in the property at the time the listing agreement was signed.

At the apparent insistence of the real estate agent Debtors had engaged to sell the property, Mr. Rippy and Ms. Land signed a second listing agreement on January 7, 2011 for the period from that date until June 2011.  A buyer was found for the property at a sales price of $315,000 and a sales contract was signed by Ms. Land and Mr. Rippy on January 13 and January 19, respectively. The sale fell through when an attorney for the buyer discovered SCBT's

judgment lien.   On January 31, 2011, Mr. Rippy and Ms. Land signed a quitclaim deed transferring the Fallen Timber property to Debtors; however, this deed was not recorded until May 2011.

Debtors filed chapter 7 bankruptcy petitions in July 2011. Each debtor claimed a homestead exemption in the Fallen Timber property.  Trustee and SCBT timely objected to the claimed exemptions, alleging that Fallen Timber is not Debtors' residence and does not qualify for a homestead exemption under state law. The objecting parties alternatively claim that Debtors cannot exempt the property under 11 U.S.C. § 522(o).  Finally, the objecting parties allege that Debtors have unclean hands as a result of their actions.[3]   Both Debtors testified in their depositions and at the hearing that they had been residing together at the Fallen Timber residence for several months prior to the bankruptcy filings.

Ms. Lafferty testified that she moved to Fallen Timber in April 2011, although she had spent a significant amount of time prior to and after that date in New York caring for her sick mother.  Prior to April 2011, when she was not in New York, Ms. Lafferty lived with Mr. Rippy at his home.   After moving into the Fallen Timber property in April 2011, Ms. Lafferty continued to travel to New York often, but testified that it was always her intent to return to the Fallen Timber property.  Mr. Lafferty testified that he moved into the Fallen Timber residence in January 2011.  He testified at his deposition and at the hearing that he wanted to move in sooner but was prevented from doing so because of the divorce proceedings.

Testimony from the witnesses deposed in the case differed regarding the dates Debtors allegedly moved into Fallen Timber.  At some point in spring 2011,[4] Amanda Gladish and Jeff Bryan moved into the Fallen Timber property with their two children.  Ms. Gladish and Mr.

---

[3] These three grounds are also the foundation for SCBT's Objection to Debtors' Lien Avoidance Motions, as the lack of a homestead exemption would result in no part of SCBT's lien being avoidable.
[4] This date was also not clear from the deposition testimony.

Bryan had an agreement with Debtors that they could live in the home rent free in return for paying all of the utility bills.  Ms. Gladish testified in her deposition that she and Mr. Bryan moved into the Fallen Timber property in April 2011 and that Debtors were living there at the time they moved in.[5]  However, Mr. Bryan testified that when Ms. Gladish and he moved into the Fallen Timber property, no one else lived there.  Mr. Bryan indicated that at the time Ms. Gladish and he moved into the home, Debtors were "talking about . . . possibly going to have to live there," but stated that other than a bed, there was no furniture in the home and no one was living there.  Mr. Rippy testified that when he helped Ms. Lafferty move some furniture into the home, Ms. Gladish and Mr. Bryan were already living there, although later in his deposition he made a statement that Ms. Lafferty was "there by herself at the time."  Debtors both testified that Mr. Lafferty moved into the home in January and that the others moved in during late March or early April.

Mr. Lafferty testified that when he moved into the house in January 2011, there was no furniture in the home and that he slept in a sleeping bag on the floor.  However, Ms. Lafferty testified that when she visited the home in February, there was a bed in one of the bedrooms which appeared to have been used.  In addition to confusion over the presence of furniture in the house, there was confusion about utility service to the house during the period Mr. Lafferty allegedly lived there by himself. The sales contract signed by Ms. Land and Mr. Rippy states, "Seller to turn utilities on prior to inspection."  When questioned about this, Mr. Lafferty appeared confused as to whether the utilities were on when he moved in, but ultimately said that he had a space heater which provided him with heat and light while he lived in the home in January.  His testimony at his deposition is as follows:

---

[5] The parties agreed to the use of the depositions of four witnesses in lieu of live testimony.

Q: [The offer] says, "Offer to purchase will be contingent upon buyer's review and approval of inspection.  Seller to turn utilities on prior to inspection."  So at least as of January the 19th there were no utilities on at Fallen Timber, correct?

A:  I believe utilities were on.  I believe they were shut off – the water was shut off at the road.

Q: So there wasn't any water at Fallen Timber at least as of January the 19th?

A:  I'm not sure exactly what utilities were there now.  I think the water was turned off.  Basically, they needed to have the utilities on so that they could come through and check the electrical, check the air conditioning, all of that type of stuff.

Q: And at that point Fallen Timber was vacant?

A: No.  Not at that time, no.

Q: What do you mean?

A: I was already living back there.

Q: Without any utilities?

A: In January.

Q: Without utilities?

A: No, there were utilities on.  They were shut off at the road.

Q: But you just testified that for the inspection they needed utilities on so they could do their walk-through?

A: They needed the electric turned back on, yes.

Q: So you were living there with no electric?

A: Yeah.  I didn't have the power turned back on in my name, no.

Q: And you were living there without any power in January?

A: Yes.

Q: The winter?

A: Yes.

Q: No water, no heat, no lights?

A: I had a propane heater.

Q: In the house?

A: Yes.

Q: And no lights?

A: The propane heater has like an infrared thing on the front of it.  And it throws light.  So when I slept there I had that.[6]

When Ms. Lafferty was questioned about the utilities in her deposition, the following exchange took place:

Q: Was there power on, when you got to the house in February?

A: Yes.  It was on because of the – Century 21.[7]

Q: Okay.  What do you mean it was on because of Century 21?

A:  The power – it's been on and off for the past four years.  I mean, when no one was there, we shut it down so it doesn't cost nothing.  It got put on again, I think, in August – I don't know.  It should have.  I can't keep – I – I don't know the dates.

Q: Do you have any reason to think that Bill would be lying, if he testified that the power wasn't on in January, when he moved in?

A: That might have been when Derrick and I switched the – the who it was under.  It was under Derrick's name at one point, and I had to switch it to mine. He had it on for me, 'cause of the deposit.  And I – and I finally switched it.  So I don't know, if there was a gap in –between there

---

[6] Deposition of William Lafferty, Exhibit 42, pg 89, line 5 to pg 91, line 2.
[7] Century 21 was the real estate agency Debtors engaged to list the property for sale.

and we did have it off for a few weeks 'cause I was in New York State.  I can't remember.  It

might have been off for a few weeks in-between there.  I'm not sure.

Q: Do you remember, perhaps, when you had it turned on the last time?

A: No, I – or the electric would know.

Q: Or the electric?

A: Yeah. When I put it on my name.

Q: Has the – you mentioned that at some point, that Bill—or the power was under Derrick's

name.  Has it been in anyone's name other than yours or Derrick's?

A: I do believe, Bill's.

Q: Bill's?  When was the power in Bill's name?

A: It's hard to say.  It's been on and off for four years.[8]

Mr. Lafferty also testified that he slept in a sleeping bag on the floor during this period of time;

however, Ms. Lafferty stated that she left a bed at Fallen Timber at all times and that when she

visited the home in February, it appeared that someone had been sleeping in it.[9]  The confusion

over utility service at Fallen Timber is important as evidence of the time Debtors moved to the

former marital home.  The issue of utility service also has a bearing on the credibility of Debtors.

Debtors conceded that their arrangement with Ms. Gladish and Mr. Bryan was that Ms.

Gladish and Mr. Bryan could live in the home rent free as long as they paid for all utilities and

that Ms. Gladish and Mr. Bryan had in fact been paying the utilities.  Despite the fact that this

means neither Debtor incurs utility expenses while residing in the Fallen Timber property, the

schedules filed by Ms. Lafferty reflect the following monthly expenses:

Electricity and heating fuel:                    $175.00

---

[8] Deposition of Lisa Lafferty, Exhibit 41, pg 48, line 8 to pg 49, line 15.
[9] Deposition of Lisa Lafferty, Exhibit 41, pg 38, line 4 to pg 39, line14; pg 43, line 17 to line 21; and pg 46, line 7 to
pg 48, line 7.

| Water and sewer: | $ 35.00 |
|---|---|
| Cell phone, cable, internet: | $175.00 |
| Home maintenance: | $ 55.00 |

Mr. Lafferty testified that currently his only income is from odd jobs, although no such income was listed on his Schedule I, and that Ms. Land pays his cell phone bill and his truck payment.[10] Mr. Lafferty also testified that the Fallen Timber property has not been insured since 2008. Further, as mentioned above, the Fallen Timber property was sold at a tax sale in November 2010 because Debtors failed to pay property taxes.  Despite all of this, Mr. Lafferty's Schedule J reflects the following expenses:

| Telephone: | $  75.00 |
|---|---|
| Homeowner's or Renter's Insurance: | $ 125.00 |
| Auto Installment Payment: | $ 385.00 |
| Real Estate Taxes: | $ 100.00 |

When questioned about the reasons they claimed these expenses in their schedules, both Debtors stated that they had listed on their schedules the anticipated expenses for the household in which they live, even though they did not actually pay those expenses.  The combination of the conflicting testimony concerning the dates Debtors returned to live at Fallen Timber and the statements as to current expenses undermines the credibility of Debtors' testimony.

Mr. Lafferty's credibility is further called into question because he submitted an application for food stamps under oath to the Department of Social Services in September 2010 and listed 6320 Adrian Highway, Conway, South Carolina as his address on the application.  He did not disclose that Ms. Land lived in the house, but did list that his son resided in the home.  In March and September 2011, Mr. Lafferty again listed the Adrian Highway address as his address

---

[10] At the time of her deposition, Ms. Land was unemployed.

9

in verifications made under oath to DSS in connection with his claim of continued eligibility for food stamps.  When questioned about this, Mr. Lafferty said he listed the Adrian Highway address on the application because even though he did not live there, he took care of his son there, and the purpose of the food stamps was to take care of him and his son.  Mr. Lafferty's credibility is further undermined by these statements under oath, before and after filing for bankruptcy relief, that his address was one other than Fallen Timber.

Six depositions were taken of witnesses in this case: Mr. and Ms. Lafferty, Derek Rippy, Regina Land, Amanda Gladish, and Jeff Bryan.  Portions of the depositions were published into the record at the hearing, and the depositions were introduced into evidence in their entirety.  Debtors also testified at the hearing.  The depositions and live testimony were rife with inconsistencies.  A summary of some of the inconsistent testimony follows:

1. <u>Magistrate Court Action by Brent Bolen</u>

A Magistrate Court action was brought by Mr. Bolen against Mr. Lafferty and Ms. Land as the result of a layaway agreement for the sale of a motorcycle.  A number of text messages between Mr. Bolen and another party, the seller of the motorcycle, were introduced into evidence, both in the Magistrate Court action and in the present case.  The text messages were introduced into evidence in this matter because the person communicating with Mr. Bolen told Mr. Bolen that his or her new address was 6320 Adrian Highway, Conway, South Carolina, and subsequently told Mr. Bolen that he or she would be "home all evening."  The identity of the author of the messages to Mr. Bolen was disputed by Mr. Lafferty.  When questioned about the identity of the messenger at the hearing, Mr. Lafferty testified that it was Ms. Land.  However, in her deposition, Ms. Land testified that Mr. Lafferty did all of the negotiating with Mr. Bolen and

that Mr. Lafferty referenced the Adrian Highway address because he was telling Mr. Bolen "where the bike was to come make a payment."[11]

2.  Mr. Lafferty's Stay at the Fallen Timber Property

Amanda Gladish, Jeff Bryan, and Ms. Land, as well as Mr. Lafferty, were all questioned at their depositions regarding whether Mr. Lafferty had been staying at Fallen Timber during certain dates.  At their depositions, Mr. Lafferty, Ms. Land, and Mr. Bryan all testified that Mr. Lafferty had not stayed at Fallen Timber for about two weeks around the 2011 Christmas holidays, because Ms. Land was out of town and Mr. Lafferty was staying with his son at her home.  All three parties also testified that Ms. Land had taken Mr. Lafferty's truck out of town with her and that Mr. Lafferty had been driving Ms. Land's car.  However, Ms. Gladish testified that with the exception of one evening, Mr. Lafferty had spent the night at Fallen Timber every night and that his truck had been parked at Fallen Timber all of those nights.

3.  Debtors' Move-In to Fallen Timber

Substantial confusion resulted when the deponents were questioned about the dates that Debtors moved into Fallen Timber.  Ms. Land testified that Mr. Lafferty moved into the home in January, as did both Debtors.  However, Derek Rippy and Jeff Bryan both testified that when Ms. Lafferty moved into Fallen Timber in late March or early April, Mr. Lafferty was not yet living there.  In fact, Mr. Bryan testified that when Mr. Lafferty decided to move in, an argument occurred because Ms. Lafferty did not want him living there.[12]  With regard to Ms. Lafferty's move-in date, Debtors both testified that she moved in before Mr. Bryan and Ms. Gladish. However, Mr. Rippy and Mr. Bryan both testified that Ms. Lafferty moved in after Mr. Bryan and Ms. Gladish.

---

[11] Deposition of Regina Land, Exhibit 43, pg 32, line 7 to pg 33, line 13.
[12] Deposition of Jeffrey Bryan, Exhibit 45, pg 49, line 2 to line 19.

There was also confusion about which rooms in the home were occupied and by whom they were occupied.  Mr. Lafferty testified at his deposition that a downstairs room in the house was used by one of Mr. Bryan and Ms. Gladish's children as a bedroom; however, all of the other deponents questioned about the living arrangements in the house indicated that the room did not have a bed in it and that no one had ever used it for a bedroom, with the exception of Mr. Rippy's children when they visited Ms. Lafferty.  There was also conflicting testimony between the deponents regarding what furniture was in the bedroom Debtors allegedly share.

## CONCLUSIONS OF LAW

### I.  Objection to Exemption

The property exemptions available to Debtors arise under state law.  South Carolina has opted out of the federal exemptions, and the South Carolina Code of Laws provides that the federal exemptions are not available to a debtor in a bankruptcy proceeding. 11 U.S.C. § 522(b)(2); S.C. Code § 15-41-35.  Each Debtor claims a homestead exemption in the Fallen Timber property under S.C. Code § 15-41-30(A)(1).  That section states:

(A) The following real and personal property of a debtor domiciled in this State is exempt from attachment, levy, and sale under any mesne or final process issued by a court or bankruptcy proceeding:
(1) The debtor's aggregate interest, not to exceed fifty thousand dollars in value, in real property or personal property that the debtor or a dependent of the debtor uses as a residence, in a cooperative that owns property that the debtor or a dependent of the debtor uses as a residence, or in a burial plot for the debtor or a dependent of the debtor, except that the aggregate value of multiple homestead exemptions allowable with respect to a single living unit may not exceed one hundred thousand dollars.  If there are multiple owners of such a living unit exempt as a homestead, the value of the exemption of each individual owner may not exceed his fractional portion of one hundred thousand dollars.

*See also In re Jones*, 397 B.R. 765, 770 (Bankr. D.S.C. 2008) ("In South Carolina, a homestead exemption is properly taken in real property that the debtor uses as a residence.") (citing S.C. Code § 15-41-30(1)). The maximum amount of the exemption is periodically adjusted by the State Budget and Control Board and as a result of such adjustments, the maximum allowable homestead exemption at the time the petitions were filed is $53,375 for a single owner and $106,750 for multiple owners.  "A residence is defined as, 'Place where one actually lives or has his home; a person's dwelling place or place of habitation; an abode; house where one's home is; a dwelling house.'"  *Jones*, 397 B.R. at 770–71 (quoting Black's Law Dictionary 1309 (7th ed. 1999)).  *See also Lanier v. Beaman*, 394 B.R. 382, 383 (E.D.N.C. 2008) ("A residence is defined by Merriam-Webster as 'the act or fact of dwelling in a place for some time' and as a 'building used as a home.'").

Trustee and SCBT argue that Debtors are not entitled to a homestead exemption in the Fallen Timber property for three reasons.  Trustee and SCBT first argue that Fallen Timber is not Debtors' residence and therefore they are not entitled to a homestead exemption in the property. They also argue that Debtors have unclean hands in transferring the property to their paramours in an attempt to avoid SCBT's judgment and therefore should not receive an exemption.  Finally, Trustee and SBT maintain that due to the property transfers, Debtors are not entitled to an exemption under 11 U.S.C. § 522(o)(4).

Because much of the testimony presented in this matter is conflicting, it is difficult to determine whether Fallen Timber is the residence of one or both Debtors.  Neither Mr. Lafferty nor Ms. Lafferty is a credible witness.  As discussed above, each Debtor's statements conflicted in numerous respects from the other's on even basic questions such as what furniture was in the bedroom that they shared, and both Debtors' statements conflicted with the other deponents'

13

testimony in several respects.   Despite this conflicting testimony, the Court concludes that although she spends a significant amount of time in New York, Ms. Lafferty appears to reside at the Fallen Timber property and considers it as her residence. While Ms. Lafferty lived with Mr. Rippy for some period of time, it appears that she returned to the Fallen Timber property prior to filing her bankruptcy petition and considered it her home.

As to Mr. Lafferty, the Court concludes based on the testimony of Debtors and deponents that the Fallen Timber property is not Mr. Lafferty's residence and he is not entitled to a homestead exemption.  As recently as September 2011, after the filing date of his bankruptcy petition, Mr. Lafferty listed on his food stamp application and recertifications, under penalty of perjury, that his address is 6320 Adrian Highway, Conway, South Carolina.  This address was also used in communications with Mr. Bolen, and the Court finds it more likely that Mr. Bolen's communications were with Mr. Lafferty than with Ms. Land. Mr. Lafferty alleged that he moved into the house without any furniture or utilities in January 2011 and lived there without either for a period of time before Ms. Lafferty, Ms. Gladish, and Mr. Bryan moved in.   However, the parties all disagreed on when Mr. Lafferty moved in, and two of the deponents indicated that he was not living there when all the other parties moved in during late March or April 2011. Further, while Mr. Lafferty drew a diagram of the home's floor plan which basically resembled that drawn by Ms. Lafferty and the other deponents, he indicated that there were four bedrooms in the home and that one of Mr. Bryan and Ms. Gladish's children lived downstairs, when all other parties testified that the downstairs room did not contain a bed and was not and had never been a bedroom.   When asked what the name of Mr. Bryan and Ms. Gladish's son was, Mr. Lafferty answered incorrectly.   While Mr. Lafferty may occasionally spend the night at Fallen

Timber, it appears that Fallen Timber is not Mr. Lafferty's residence and therefore he is not entitled to a homestead exemption.

Even if Mr. Lafferty were otherwise entitled to a homestead exemption, the Court finds that both Debtors lost their entitlements to such an exemption by virtue of their conduct prior to and during their bankruptcy proceedings. The doctrine of unclean hands is based on the equitable maxim which states, "Whoever comes into equity must come with clean hands." *In re King*, No. 10-05756-dd, 2010 WL 5173191, at *4 (Bankr. D.S.C. Sept. 13, 2010) (quoting Am. Jur. Equity § 98). "This maxim illustrates the principle that the court will not grant relief to a party who has engaged in wrongful, illegal, or unethical acts." *Id. See also In re Jake's on the Pike*, 78 B.R. 461, 463 (Bankr. E.D. Va. 1987) ("The Bankruptcy Court is unquestionably a court of equity. The familiar maxim that 'he who comes into equity must come with clean hands' means that a litigant cannot call upon a court of equity to grant him extraordinary relief if he himself has been guilty of of [sic] inequitable or unconscionable conduct."). Another bankruptcy court in this Circuit has stated:

> The purpose of the unclean hands doctrine is to prevent a court from aiding or abetting a party in the commission of a fraud or other misconduct. "The primary principle guiding application of the unclean hands doctrine is that the alleged inequitable conduct must be connected, *i.e.*, have a relationship, to the matters before the court for resolution. We will not refuse relief to a party merely because it has engaged in misconduct which is unrelated to its claims before the court."

*In re Janssens*, 449 B.R. 42, 65 (Bankr. D. Md. 2010) (quoting *New Valley Corp. v. Corporate Prop. Assocs. 2 & 3 (In re New Valley Corp.)*, 181 F.3d 517, 525 (3d Cir. 1999)). *See also In re Uwimana*, 274 F.3d 806, 810–11 (4th Cir. 2001); ("A court can deny relief under the doctrine of unclean hands only when there is a close nexus between a party's unethical conduct and the transactions on which that party seeks relief. . . . We are not open to arguments about a party's general moral fitness, but only apply the unclean hands doctrine to prevent a party from using the

courts to reap the benefits of wrongdoing."); *Rawles v. Wych (In re Rawles)*, Adv. No. 08-00555, Bankr. No. 07-23145-WIL, 2009 WL 2924005, at *3 (Bankr. D. Md. June 18, 2009) ("'The doctrine of "unclean hands" demands that a plaintiff act fairly in the matter for which he seeks a remedy.' . . . A court can deny relief under the unclean hands doctrine only where there is a 'close nexus between a party's unethical conduct and the transactions on which that party seeks relief.'") (citations omitted).

Here, Debtors' wrongful actions clearly relate to the bankruptcy proceeding, the homestead exemptions they seek, and the judicial lien Debtors seek to avoid. Debtors first transferred Fallen Timber to their paramours with the wrongful intent to defraud SCBT and avoid its judgment.[13] Once Debtors realized that the transfer would not benefit them, they requested that the property be transferred back to them so that they could obtain a homestead exemption when they filed their bankruptcy cases. Debtors have been, at the very least, less than truthful during the bankruptcy proceedings, both in testimony and in their schedules and statements filed with the Court. Debtors both have unclean hands as a result of their conduct in and relating to this bankruptcy proceeding and should not be entitled to benefit from their wrongful conduct by recognition of a homestead exemption in Fallen Timber. *See In re Sanford*, No. 09-01116-jw, slip op., at 7 (Bankr. D.S.C. Oct. 1, 2009) ("[T] he Court may deny a debtor's exemption where the debtor, either intentionally or with reckless disregard for the truth, failed to disclose all assets of the bankruptcy estate.") (citing *In re Vidis*, No. 08-03242, docket #67, at 5 (Bankr. D.S.C. Feb. 23, 2009)). *See also In re Cooper*, No. 03-00900-W, slip op., at 3 (Bankr. D.S.C. May 7,

---

[13] Debtors testified that the purpose of the transfer was to place the property in the hands of "neutral" persons while Ms. Lafferty was out of state taking care of her mother. In light of the timing of the transfer in conjunction with the filing of the judgment, this is simply not credible. A power of attorney could have been used to afford Ms. Lafferty flexibility and authorize another person to handle her affairs. The purpose of the transfer was to divest the parties of title to the property in an effort to prevent attachment of SCBT's lien.

2003) (sustaining the United States Trustee's objection to the debtors' exemption in tax refunds based on the debtors' failure to amend their schedules to disclose the tax refunds).

Debtors are also not entitled to a homestead exemption by virtue of section 522(o). Section 522(o) states:

> For purposes of subsection (b)(3)(A), and notwithstanding subsection (a), the value of an interest in –
> (1) real or personal property that the debtor or a dependent of the debtor uses as a residence;
> (2) a cooperative that owns property that the debtor or a dependent of the debtor uses as a residence;
> (3) a burial plot for the debtor or a dependent of the debtor; or
> (4) real or personal property that the debtor or a dependent of the debtor claims as a homestead;
> shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.

Pre-bankruptcy planning, on its own, is not fraudulent. *Jones*, 397 B.R. at 770 (citing *In re Evans*, 334 B.R. 148, 152 (Bankr. D. Md. 2004)). However, planning for the purpose of defrauding creditors can result in the loss of an otherwise available exemption. *Hanson v. First Nat'l Bank in Brookings,* 848 F.2d 866, 868 (8th Cir. 1988) (citing *Ford v. Poston*, 773 F.2d 52, 55 (4th Cir. 1985)). While Congress did not define the phrase "with the intent to hinder, delay, or defraud" in the context of section 522(o), other courts have construed this phrase in accordance with the standards for the substantially similar phrases included in section 548 and section 727. *In re Addison*, 540 F.3d 805, 811 (8th Cir. 2008). A finding of fraudulent intent generally requires that there "'appear in evidence some facts or circumstances which are extrinsic to the mere facts of conversion of non-exempt assets into exempt and which are indicative of such fraudulent purpose.'" *Id.* at 813 (quoting *In re Sholdan*, 217 F.3d 1006, 1010 (8th Cir. 2000)).

Extrinsic evidence of fraud can include conversion of a large amount of property, "conduct intentionally designed to materially mislead or deceive creditors about the debtor's position or use of credit to buy exempt property," or conveyance of property for no or inadequate consideration. *Addison*, 540 F.3d at 816 (quoting *In the Matter of Armstrong*, 931 F.2d 1233, 1237–38 (8th Cir. 1991)). *See also In re Seymour*, No. 10-00377-jw, slip op., at 5 (Bankr. D.S.C. Aug. 17, 2010) (quoting *In re Weldon*, 184 B.R. 710, 713 (Bankr. D.S.C. 1995)). Here, Debtors conveyed non-exempt property, real estate in which they did not reside, to their paramours for no consideration at or near the time a judgment lien attached to the property.

In order to determine a debtor's subjective intent, courts have commonly looked to badges of fraud. *Addison*, 540 F.3d at 811–12; *In re Klinglesmith*, No. 6:10-bk-00416-KSJ, 2011 WL 2471582, at *5 (Bankr. M.D. Fla. June 2, 2011); *Seymour*, No. 10-00377-jw, at 6; *In re Booth*, 417 B.R. 820, 823 (Bankr. M.D. Fla. 2009). While courts have identified a number of different badges of fraud, in this district courts commonly examine the following:

    (1) The insolvency or indebtedness of the transferor;

    (2) Lack of consideration for the conveyance;

    (3) Relationship between the transferor and the transferee;

    (4) The pendency or threat of litigation;

    (5) Secrecy or concealment;

    (6) Departure from the usual method of business;

    (7) The transfer of debtor's entire estate;

    (8) The reservation of benefit to the transferor; and

    (9) The retention by the debtor of possession of the property.

*Jones*, 397 B.R. at 770 (quoting *In re Ducate*, 369 B.R. 251, 261 (Bankr. D.S.C. 2007)).  "The presence of one badge of fraud does not necessarily establish fraudulent intent, while 'a confluence of badges can constitute conclusive evidence of an actual intent to defraud.'" *Klinglesmith*, 2011 WL 2471582, at *5 (quoting *Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1272 (11th Cir. 1998)).

In January 2010, when the Fallen Timber property was vacant and neither Debtor was entitled to a homestead exemption, Debtors transferred their interests in the nonexempt property to their paramours.  While Mr. Lafferty testified that the reason for the transfer was to ensure everything was "fair and equal" with respect to the property during their divorce, this statement is not credible.  Ms. Lafferty stated that the reason she transferred her interest to Mr. Rippy was because she was traveling back and forth to New York and needed someone to look after her affairs. The parties' divorce was finalized in May 2010 and both Debtors testified that they reconciled soon after, yet the deed transferring the property to Ms. Land and Mr. Rippy was recorded in December 2010, after the parties had allegedly reconciled, obviating the need for fairness and equality with respect to the property, and, importantly, after SCBT obtained and recorded its judgment against the house in August 2010.

On the same date that SCBT obtained its judgment, Debtors listed the Fallen Timber property for sale, and Debtors continued their efforts to sell the property until an offer was received and a closing was scheduled for March 2011.  The sale did not go through because the purchaser discovered the existence of SCBT's judgment lien.  Debtors claim that they were not aware of the judgment prior to that date.  However, Debtors sent information about the judgment to their realtor in August 2010.  The property was transferred back to Debtors on January 31, 2011.  While the exact timeline of events is unclear, the contract of sale for the home was signed by Ms.

Land and Mr. Rippy on January 13 and January 19, 2011, and the lien was discovered by the potential purchaser soon thereafter.  The deed returning the property to Debtors, however, was not recorded until May 2011, just prior to Debtors' bankruptcy filings. Testimony indicated this happened shortly after Debtors learned about homestead exemptions on the Internet.

It appears that the transfers between Debtors, Ms. Land, and Mr. Rippy were completed with the intent to avoid the effects of SCBT's judgment.   While Debtors vehemently argued otherwise, Debtors proved themselves throughout the course of this litigation to be less than credible witnesses.  The transfers by Debtors to their paramours were for no consideration, and the timing of the transfers and the recording of the deeds in conjunction with the dates of SCBT's judgments and the alleged reconciliation of Debtors undermines Debtors' contention that the transfers were for the purpose of fairness during the parties' marital litigation.  Extrinsic evidence of fraud clearly exists in this case.

Further, several badges of fraud are present here, leading the Court to infer Debtors' actual intent to defraud SCBT.  Debtors made the transfers to their paramours for no consideration and testified that they did not intend a transfer of ownership but merely wanted their paramours to hold the property for a period of time.  Ms. Land and Mr. Rippy testified that they acted at Debtors' direction with respect to the property; Mr. Rippy even stated that he felt as though Ms. Land and he were "puppets" of Debtors.  Debtors testified that they were not aware of the SCBT judgment until the title search uncovered it in January 2012; however, Debtors were both served with copies of the judgment after it was obtained by SCBT.  Debtors transferred their interests in Fallen Timber to their paramours in January 2010, just prior to the commencement of the foreclosure of Debtors' commercial property by SCBT in February 2010.  The property was transferred back to Debtors after the sale of the home fell through due to the discovery of the

judgment by the potential purchaser, and the deed transferring the property back to Debtors was

recorded just prior to the bankruptcy filings.

Some courts have used a four part test in addressing an objection to a homestead exemption

under section 522(o).  The test used by these courts requires:

> (1) that the debtor disposed of property within the 10 years preceding the filing of the bankruptcy petition,
> (2) that the proceeds from such disposition were used to increase the value of the debtor's homestead,
> (3) that the property disposed of was not itself exempt, and
> (4) that in doing so, the debtor acted with the intent to hinder, delay, or defraud a creditor.

*Wolters v. Lakey*, 456 B.R. 687, 701 (D. Kan. 2011) (quoting *In re Keck*, 363 B.R. 193, 208

(Bankr. D. Kan. 2007)).  *See also Danussi v. Kaska*, 424 B.R. 616, 619–20 (N.D.N.Y. 2010)

(quoting *In re Presto*, 376 B.R. 554, 568 (Bankr. S.D. Tex. 2007)) (using four part test

established by Texas bankruptcy courts); *In re Sissom*, 366 B.R. 677, 688 (Bankr. S.D. Tex.

2007) ("[T]o prevail under § 522(o), four elements must be proven: (1) the debtor disposed of

property within 10 years preceding the bankruptcy filing; (2) the property that the debtor

disposed of was nonexempt; (3) some of the proceeds from the sale of the nonexempt property

were used to buy a new homestead, improve an existing homestead or reduce the debt associated

with an existing homestead, or alternatively, to buy a new principal residence used by

dependents of the debtor, improve an existing principal residence used by dependents of the

debtor, or reduce the debt associated with a principal residence used by dependents of the debtor;

and (4) the debtor disposed of the nonexempt property with the intent to hinder, delay or defraud

a creditor.").

The Court notes that the four part tests cited above differ slightly but generally contain

the same requirements.  These tests contemplate a situation where a debtor sells nonexempt

property and uses the proceeds obtained from the sale to purchase or improve exempt property. While the present case does not exactly fit within that mold, this case does meet the requirements of section 522(o).

The timing of the transfers, recording of deeds, and Debtors' alleged moves back to the Fallen Timber property indicate that Debtors' actions were taken with the intent to hinder, delay, or defraud SCBT.  Debtors disposed of nonexempt property within the ten year period prior to their bankruptcy filings, yet maintained control of the property.  When the property was transferred back to them, they received back the entire value of the property, which would be exempt but for Debtors' actions, discussed in detail above.  The requirements of section 522(o) are met and Debtors' homestead exemption should be reduced to $0.  Trustee's Objections to Exemption are sustained.

## II.  Motion to Avoid Judicial Lien

11 U.S.C. § 522(f) provides:

(1) Notwithstanding any waiver of exemptions but subject to paragraph (3), the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is –
(A) a judicial lien, other than a judicial lien that secures a debt of a kind that is specified in section 523(a)(5); or
(B) a nonpossessory, nonpurchase-money security interest in any –
(i) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;
(ii) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or
(iii) professionally prescribed health aids for the debtor or a dependent of the debtor.
(2)(A) For the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of –
(i) the lien;

22

(ii) all other liens on the property; and

(iii) the amount of the exemption that the debtor could claim if there were no liens on the property;

exceeds the value that the debtor's interest in the property would have in the absence of any liens.

The Fourth Circuit has recently held that a debtor need not actually claim an exemption to avoid a judicial lien, but must be entitled to one. *See Botkin v. DuPont Cmty. Credit Union*, 650 F.3d 396, 399–400 (4th Cir. 2011) (quoting *Owen v. Owen*, 500 U.S. 305, 310–11 (1991)).   Debtors are not entitled to a homestead exemption for the reasons previously discussed, and therefore the judgment lien of SCBT does not impair an exemption to which Debtors would have been entitled.   Debtors' Motions to Avoid Judicial Lien are denied.

## <u>CONCLUSION</u>

For the reasons set forth above, Trustee's Objections to Exemptions are sustained. Debtors cannot take homestead exemptions in the Fallen Timber property.   Because they have no homestead exemptions, Debtors cannot avoid SCBT's judgment lien.   Debtors' Motions to Avoid Judicial Lien are denied.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**04/03/2012**



Entered: 04/03/2012

David R. Duncan
US Bankruptcy Judge
District of South Carolina

23